Russell P. Cohen (SBN 213105)
**Dechert LLP**
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4506
Facsimile: (415) 262-4555
Russ.Cohen@dechert.com

John (Jay) Jurata, Jr. (*pro hac vice* pending)
**Dechert LLP**
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333
Jay.Jurata@dechert.com

Julia Chapman (*pro hac vice* pending)
**Dechert LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
Telephone: (215) 994-2060
Facsimile: 215) 994-2222
Julia.Chapman@dechert.com

*Attorneys for Defendant Microsoft Corporation*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bryant et al.,<br><br>Plaintiffs<br><br>v.<br><br>Microsoft Corporation,<br><br>Defendants. | Case No. 5:25-cv-08733-PCP<br><br>**DEFENDANT MICROSOFT CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO STATE A CLAIM**<br><br>**SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: March 12, 2026<br>Time: 10:00 am<br>Place: Courtroom 8, 4th Floor<br>Judge: Hon. P. Casey Pitts |

## TABLE OF CONTENTS


MEMORANDUM OF POINTS AND AUTHORITIES ..... 1
INTRODUCTION ..... 1
FACTUAL BACKGROUND ..... 3
- I. Plaintiffs Are Subscribers to Open AI's ChatGPT Service ..... 3
- II. Microsoft-OpenAI Collaboration ..... 3
- III. AI Chatbot Competition Is Thriving ..... 5
- IV. Plaintiffs' Claims ..... 5

LEGAL STANDARD ..... 7
ARGUMENT ..... 7
- I. Plaintiffs Fail to Plausibly Allege Antitrust Standing or Antitrust Injury ..... 7
  - A. Plaintiffs Lack Antitrust Standing ..... 7
    - 1. Plaintiffs' Alleged Harm Is Indirect ..... 8
    - 2. Plaintiffs' Alleged Injury Is Speculative ..... 9
  - B. Plaintiffs Fail to Plausibly Allege Antitrust Injury ..... 11
- II. Plaintiffs Fail to Plausibly Allege an Anticompetitive Agreement ..... 12
  - A. Per Se Treatment Does Not Apply ..... 14
  - B. Plaintiffs Fail to Plausibly Allege Anticompetitive Effects ..... 15
    - 1. Plaintiffs Fail to Plausibly Allege Direct Evidence of Anticompetitive Effects ..... 16
    - 2. Plaintiffs Fail to Plausibly Allege Indirect Evidence of Anticompetitive Effects ..... 17
- III. Plaintiffs' State Law Claims Also Fail ..... 20
  - A. Most Plaintiffs Lack a Sufficient Nexus to California ..... 20
  - B. Plaintiffs' Cartwright Act Claim Fails ..... 22
  - C. Plaintiffs' UCL Claim Fails ..... 22

CONCLUSION ..... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) .......... 13, 19

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) .......... 11, 12

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) .......... 14

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010) .......... 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 7, 9

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .......... 9

*Bakay v. Apple Inc.*,
2025 WL 3012822 (9th Cir. Oct. 28, 2025) .......... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 7, 13

*Bhan v. NME Hosps., Inc.*,
929 F.2d 1404 (9th Cir. 1991) .......... 18

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .......... 12, 13, 14, 16

*Cal. Crane Sch., Inc. v. Google LLC*,
2023 WL 2769096 (N.D. Cal. Mar. 31, 2023) .......... 11, 12

*Cascades Comput. Innovation LLC v. RPX Corp.*,
2013 WL 316023 (N.D. Cal. Jan. 24, 2013) .......... 13

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) .......... 23

*Churchill Vill., L.L.C. v. Gen. Elec. Co.*,
169 F. Supp. 2d 1119 (N.D. Cal. 2000), *aff'd sub nom. Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .......... 20, 21

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021)....................7, 8, 9, 11

*Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*,
149 F. Supp. 3d 1188 (E.D. Cal. 2015)....................22

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001)....................22

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)....................18

*Daro v. Superior Ct.*,
151 Cal. App. 4th 1079, 61 Cal. Rptr. 3d 716 (2007)....................22

*DMI v. Med. Sec. Card Co. LLC*,
2013 WL 12171848 (C.D. Cal. Oct. 3, 2013)....................21

*Don Copeland v. Energizer Holdings, Inc.*,
716 F. Supp. 3d 749 (N.D. Cal. 2024) ....................18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ....................8, 11

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022)....................7, 23

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................*passim*

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)....................15

*In re German Auto. Mfrs. Antitrust Litig.*,
612 F. Supp. 3d 967 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) ....................13, 17, 19

*Gibson v. Cendyn Grp.*,
LLC, 148 F.4th 1069 (9th Cir. 2025)....................12, 14, 15

*Hahn v. Or. Physicians' Serv.*,
868 F.2d 1022 (9th Cir. 1988)....................14

*Hambrick v. Healthcare Partners Med. Grp., Inc.*,
189 Cal. Rptr. 3d 31 (Cal. Ct. App. 2015) ....................23

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018)....................17

*HomeLight, Inc. v. Shkipin*,
694 F. Supp. 3d 1242 (N.D. Cal. 2023) .......... 16

*Intel Corp. v. Seven Networks, LLC*,
562 F. Supp. 3d 454 (N.D. Cal. 2021) .......... 15

*Kay v. Copper Cane, LLC*,
549 F. Supp. 3d 1014 (N.D. Cal. 2021) .......... 20

*Kramer v. Toyota Motor Corp.*,
705 F.3d 1122 (9th Cir. 2013) .......... 1

*Krehl v. Baskin Robbins Ice Cream Co.*,
664 F.2d 1348 (9th Cir. 1982) .......... 14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) .......... 15

*Lorenzo v. Qualcomm Inc.*,
603 F. Supp. 2d 1291 (S.D. Cal. 2009) .......... 7, 11

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......... 15

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) .......... 7

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 17

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
202 F.3d 1088 (9th Cir. 2000) .......... 22

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 12, 14

*Pac. Recovery Sols. v. United Behav. Health*,
481 F. Supp. 3d 1011 (N.D. Cal. 2020) .......... 18

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 14, 17

*Redbox Automated Retail, LLC v. Buena Vista Home Entm't., Inc.*,
399 F. Supp. 3d 1018 (C.D. Cal. 2019) .......... 15

*Reynolds v. Binance Holdings Ltd.*,
481 F. Supp. 3d 997 (N.D. Cal. 2020) .......... 4

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) .......... 23

*Staley v. Gilead Scis., Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020) .......... 13

*Sullivan v. Oracle Corp.*,
51 Cal. 4th 1191 (2011) .......... 20

*Swain v. CACH, LLC*,
699 F. Supp. 2d 1117 (N.D. Cal. 2009) .......... 22

*T-Mobile US, Inc. v. WCO Spectrum LLC*,
2025 WL 3247762 (C.D. Cal. Oct. 31, 2025) .......... 19

*Terpin v. AT&T Mobility, LLC*,
399 F. Supp. 3d 1035 (C.D. Cal. 2019) .......... 20

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006) .......... 12, 14, 15

*In re Toyota Motor Corp.*,
785 F. Supp. 2d 883 (C.D. Cal. 2011) .......... 21

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023), *cert. denied*, 145 S. Ct. 544 (2024) .......... 14

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
903 F. Supp. 2d 880 (C.D. Cal. 2012) .......... 8

*Wilson v. Frito-Lay N. Am., Inc.*,
961 F. Supp. 2d 1134 (N.D. Cal. 2013) .......... 20

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......... 23

Cal. Bus. & Prof. Code § 17204 .......... 22

**Other Authorities**

DATA CTR. DYNAMICS (Nov. 3, 2025), https://tinyurl.com/3n2bzfn2 .......... 4

MICROSOFT (Jan. 21, 2025),
https://blogs.microsoft.com/blog/2025/01/21/microsoft-and-openai-evolve-partnership-to-drive-the-next-phase-of-ai/ .......... 4

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 12, 2026, at 10:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 8 of this Court, located on the 4th Floor of the Robert F. Peckham Courthouse, 280 South First Street, San Jose, California, 95113, Microsoft Corp. ("Microsoft") will move the Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order to dismiss Plaintiffs' Complaint for failure to state a claim.

This Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; any reply memorandum; the pleadings and files in this action; and such other matters Microsoft may present at or before the hearing.

DATED: December 12, 2025

**DECHERT LLP**

By: */s/ Russell P. Cohen*
Russell Cohen (SBN 213105)
Dechert LLP
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4500
russ.cohen@dechert.com

John (Jay) Jurata, Jr. (*pro hac vice* pending)
Dechert LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
jay.jurata@dechert.com

Julia Chapman (*pro hac vice* pending)
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 9104-2808
Telephone: (215) 994-4000
julia.chapman@dechert.com

*Attorneys for Defendant Microsoft Corporation*

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION[1]

Despite spanning 95 pages and 421 paragraphs, Plaintiffs' Complaint never pleads the most basic requirements of an antitrust claim under the Sherman Act. Plaintiffs recast Microsoft's well-publicized collaboration with OpenAI as a scheme to hobble OpenAI and force price increases to divert subscribers to Microsoft Copilot. But that fact-free theory is conclusory, makes no economic sense, and is implausible under *Twombly* and *Iqbal*.

The Complaint's own allegations show that Microsoft's collaboration with OpenAI began years before the supposed harm and consists of Microsoft supplying cloud services that enabled OpenAI's research and product development—procompetitive conduct the antitrust laws are designed to ***encourage***. Plaintiffs attempt to label that vertical agreement between Microsoft, a supplier of compute, and OpenAI, a massive user of compute, as a per se violation. But per se treatment is reserved for only a narrow set of manifestly anticompetitive restraints. Decades of binding precedent requires a rule of reason analysis and plausible allegations of actual harm to competition—none of which Plaintiffs plead.

Accordingly, if the Court reaches this motion, it should dismiss the Complaint for at least the following reasons:

1. ***Plaintiffs fail to plead antitrust standing or antitrust injury***. Plaintiffs lack threshold antitrust standing because their alleged injury is indirect and speculative. They purchased ***nothing from Microsoft***. And as to their purchases from OpenAI, they allege no facts suggesting

---

[1] Microsoft also simultaneously moves to compel Plaintiffs to individually arbitrate their claims against it as required by the Terms of Use they agreed to when they created their ChatGPT accounts with OpenAI and purchased their ChatGPT Plus subscriptions from OpenAI. *See* Motion to Compel, Dkt. No. 20. As explained in Microsoft's motion, equitable estoppel prevents Plaintiffs from avoiding their arbitration agreement with OpenAI by suing Microsoft instead, because their claims against Microsoft are "intimately founded in and intertwined with" the underlying contract, or allege "substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1129 (9th Cir. 2013) (cleaned up, citation omitted). If the Court grants Microsoft's motion to compel, this Court need not address this motion to dismiss. By filing both motions at the same time, Microsoft does not waive, and expressly preserves, all rights, including appellate rights under the Federal Arbitration Act, arguments, and defenses, including without limitation its jurisdictional, procedural, and substantive defenses.

that Microsoft sets ChatGPT Plus's pricing or features. They also fail to allege that they actually paid inflated prices or received degraded ChatGPT Plus services from OpenAI. Their claimed injury is neither direct nor proximate and is riddled with speculation. For similar reasons, Plaintiffs lack antitrust injury. Plaintiffs allege they were harmed in the ***downstream*** Consumer Generative AI ("CGAI"). But because the conduct they challenge occurred in the ***upstream*** cloud-services business—an alleged exclusive vertical supply agreement between Microsoft and OpenAI—they cannot show antitrust injury under settled Circuit law.

2. ***Plaintiffs fail to plead any facts suggesting an unlawful agreement under Section 1 of the Sherman Act***. Plaintiffs impermissibly seek to avoid their burden of showing that this strategic partnership and vertical supply agreement are anticompetitive by labeling it as a per se violation. But the per se rule is reserved for only a limited set of restraints, and the conduct alleged here bears no resemblance to those practices. Because courts consistently recognize that vertical supply agreements can have procompetitive benefits, the rule of reason applies. Plaintiffs plead no facts showing this vertical agreement caused harm to competition, which dooms their claim. If anything, Plaintiffs' Complaint demonstrates that Microsoft's provision of cloud computing services to OpenAI was procompetitive.

3. ***California state law claims fail as a matter of law***. Nine of the 11 named Plaintiffs are residents of states other than California, and California statutes do not apply extraterritorially to out-of-state conduct or injuries. In any event, the Cartwright Act claim is conclusory and fails for the same reasons as the federal claim. And the UCL claim fails for lack of standing, the absence of any legal violation or unfair conduct, the availability of an adequate remedy at law, and the absence of any likelihood of future harm warranting injunctive relief.

***

Plaintiffs do not plausibly allege they suffered any cognizable "harm" caused by Microsoft. And Plaintiffs cannot avoid that fatal defect by seeking to circumvent their agreement with OpenAI to arbitrate their claims. *See* Motion to Compel Arbitration, Dkt. 20. If the Court reaches this motion, it should dismiss the Complaint with prejudice.

## FACTUAL BACKGROUND[2]

### I. Plaintiffs Are Subscribers to Open AI's ChatGPT Service

OpenAI is an artificial intelligence company that provides a free and paid subscription-based generative AI service, ChatGPT, which allows users to interact with large language models to generate text, answer questions, and perform other AI-powered tasks. Complaint, ECF No. 1, ¶ 6. OpenAI released ChatGPT on November 30, 2022 (*id.* ¶¶ 6, 68) and made it available for free to the public. Beginning in February 2023, OpenAI also began providing a paid ChatGPT subscription service called ChatGPT Plus. *Id.* ¶ 6. Plaintiffs are ChatGPT subscribers who, at various points in time from February 2023 to present, paid for a ChatGPT Plus subscription to obtain ChatGPT Plus directly from OpenAI. *Id.* ¶¶ 6, 16-26. Plaintiffs allege that at all relevant points in time they each paid and/or continue to pay OpenAI $19.99 or $20.00 per month for their ChatGPT Plus Subscriptions. *Id.*

### II. Microsoft-OpenAI Collaboration

Microsoft is a multinational technology company that develops, licenses, and supports a wide range of software, services, devices, and hardware including Microsoft Windows, Office 365, and cloud computing. *Id.* ¶¶ 27-28. Through its Azure platform, Microsoft supplies cloud computing services to businesses, developers, and organizations that require scalable computing power and storage. *Id.* ¶¶ 32-33.

Microsoft was also an early investor in and is a strategic partner to OpenAI. *Id.* ¶ 86. In July 2019, Microsoft and OpenAI publicly commenced a strategic partnership whereby Microsoft invested $1 billion in OpenAI and agreed to build massive, highly customized supercomputers for OpenAI to use to develop and train its GPT models. *Id.* ¶¶ 86-88. In return, OpenAI agreed to share those models with Microsoft so that Microsoft could create software and services incorporating access to OpenAI's technology. *Id.* OpenAI also agreed to make its services available exclusively on Azure. *Id.*

This collaboration launched a wave of innovation in generative AI. The companies began

---

[2] For the purposes of this Motion to Dismiss, Microsoft relies (as it must) on the factual allegations set forth in Plaintiffs' Complaint and the materials expressly referenced in it.

working together to develop the next generation of software and GPU clusters. *Id.* ¶ 92. By November 2019, the collaboration resulted in OpenAI's creation of the GPT-2 model. *Id.* ¶ 64. Just seven months later, in June 2020, OpenAI launched the "massively expanded" and "full-scale commercial" GPT-3 model. *Id.* ¶¶ 66-67. During this time, Microsoft invested another $2 billion in OpenAI, which "paid for the huge amounts of computing power that OpenAI needed to build [its] chatbot." *Id.* ¶¶ 93, 99. In November 2022, OpenAI released ChatGPT, an AI chatbot that quickly gained widespread attention. *Id.* ¶ 6. Shortly after, in January 2023, Microsoft and OpenAI extended their partnership. *Id.* ¶ 99. Microsoft invested another $10 billion in OpenAI, which would "provide OpenAI with even larger amounts of computing power." *Id.* ¶ 94. In return, Microsoft would deploy OpenAI's models across Microsoft's consumer and enterprise services and continue to serve as OpenAI's exclusive supplier of cloud computing services. *Id.* ¶ 99. In February 2023, OpenAI commercialized its models by launching its ChatGPT Plus subscription service. *Id.* ¶ 6.

Microsoft competes with large technology companies including Google, Amazon, and others to provide cloud computing services of the type required by OpenAI and other AI developers. *Id*. ¶¶ 82, 114, 255. As the AI race has intensified, demands for massive computing power have grown, fostering a highly competitive cloud computing marketplace with multiple large-scale providers vying for AI workloads. *Id.* ¶¶ 171-72. In January 2025,[3] to meet OpenAI's expanding compute needs, Microsoft and OpenAI again renegotiated their strategic partnership to end the exclusive cloud supply agreement. *Id.* Subsequently, in June 2025, OpenAI announced a cloud deal to obtain cloud services from Google. *Id.* Today, OpenAI continues to purchase Azure cloud services from Microsoft, along with several other cloud partners including Amazon Web Services, Google Cloud, Oracle, and CoreWeave.[4] *Id.*

---

[3] *Microsoft and OpenAI Evolve Partnership to Drive the Next Phase of AI*, MICROSOFT (Jan. 21, 2025), https://blogs.microsoft.com/blog/2025/01/21/microsoft-and-openai-evolve-partnership-to-drive-the-next-phase-of-ai/. Pursuant to Federal Rule of Evidence 201, the Court "may take judicial notice of publicly available newspaper and magazine articles and web pages that indicate what was in the public realm at the time." *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1002 (N.D. Cal. 2020).

[4] *OpenAI Signs $38bn Multi-year Cloud Deal with AWS for Access to Nvidia GB200s and GB300s*, DATA CTR. DYNAMICS (Nov. 3, 2025), https://tinyurl.com/3n2bzfn2.

**III. AI Chatbot Competition Is Thriving**

Numerous companies offer AI chatbots and compete for consumers. Following the release of ChatGPT in January 2023, competitors ranging from Google, Anthropic, and Perplexity AI all launched competing chatbots. *Id.* ¶¶ 231-32 (comparing competing Consumer Generative AI chatbots in October 2023). In October 2023, Microsoft began selling a commercial subscription to its Generative AI tool, Copilot—which is built on OpenAI's models—to consumers as part of its Microsoft Office 365 suite of applications. *Id.* ¶¶ 30, 133. Subscriptions to the Microsoft Office 365 suite of applications with Copilot cost $30 per month. *Id.* ¶ 133.

By 2025, many major chatbot competitors had hit the market, including ChatGPT, Deepseek, Perplexity, Claude, Google Gemini, and others. *Id.* ¶ 233-34. And later in 2025, even more companies launched their own chatbots, including xAI's Grok and Kommo's Komo. *Id.* ¶¶ 236-37. DeepSeek's early 2025 launch was particularly significant because its AI model and chatbot was developed "at a fraction of the cost and using a fraction of the computing power used by OpenAI." *Id.* ¶ 137. This was despite the fact that U.S. export controls had limited DeepSeek's "ability to obtain scarce Nvidia GPUs required to train an LLM at scale." *Id.* ¶ 140. According to the Complaint, by July and August 2025, Microsoft's Copilot had between five and 14 percent of chatbot usage. *Id.* ¶¶ 233-34, 236, 279, 281.

**IV. Plaintiffs' Claims**

Against this backdrop of innovation and competition, Plaintiffs claim they have been injured because, absent Microsoft's strategic partnership with OpenAI, OpenAI allegedly would have "lowered prices for its Consumer Generative AI products" or "provided additional features, more sophisticated models, and better service." *Id.* ¶ 367. Yet Plaintiffs have not sued OpenAI, the party from whom they directly purchased ChatGPT Plus subscriptions and that set the pricing and features of the ChatGPT services. *See generally id.* ¶¶ 6-7, 63-68, 113, 146, 159-61, 173, 176, 178 (conceding that OpenAI "maintain[s]," "charge[s]," "reduce[s]," and otherwise sets its own pricing for its services).

Plaintiffs instead seek to pin this alleged harm on Microsoft (presumably to avoid the arbitration agreement in OpenAI's TOU). *See* Motion to Compel Arbitration, Dkt. No. 20.

Plaintiffs claim that: (i) Microsoft entered into an unlawful agreement with OpenAI to limit cloud-computing services to OpenAI (Compl. ¶ 3); (ii) OpenAI purportedly responded by raising prices or degrading service (*id.* ¶ 131); and (iii) subscribers were thereby harmed (*id.* ¶ 5). The Complaint does not include any factual allegations to substantiate this theory, which is nowhere near a per se antitrust claim and does not come close to satisfying the basic elements of a rule of reason claim. Nor does the Complaint offer any plausible explanation as to why Microsoft would want to throttle OpenAI or harm its subscribers, which would in turn harm Microsoft's $13 billion investment in OpenAI by shrinking demand, reducing shared revenue, and risking OpenAI's continued development of the leading generative AI models that Microsoft has licensed and deploys in its Copilot services. *Id.* ¶ 101-02.

Plaintiffs' factual allegations regarding Microsoft amount to the following:

- Microsoft entered into an exclusive cloud services supply agreement with OpenAI in July 2019. *Id.* ¶¶ 86-88.
- Microsoft sought to "deepen" its relationship with OpenAI and "extended" the partnership in 2023. *Id.* ¶¶ 93, 96, 99, 101.
- Microsoft "deployed and promoted its own competing Consumer Generative AI products." *Id.* ¶ 132.
- Microsoft and OpenAI ended their exclusive cloud supply agreement in 2025 at which point OpenAI entered into cloud deals with alternative cloud service providers. *Id.* ¶¶ 170-72.
- Ending the exclusive cloud supply agreement reduced the price of API tokens—a product that the ChatGPT subscribers do ***not*** allege they ever purchased. *Id.* ¶¶ 173-79.

And, to fill the gaps in their story, Plaintiffs offer only conclusory assertions. For example:

- Microsoft's cloud supply agreement with OpenAI had a "lock-in effect" that "forced" OpenAI to reduce its output and degrade its own ChatGPT service. *Id.* ¶¶ 92, 129, 131-32, 166-68, 170, 187, 290-95.
- Microsoft "squeez[ed]," "refus[ed] to expand," "restricted," "continued to constrain," and "imposed artificial capacity restraints" on "the supply of compute available to OpenAI." *Id.* ¶¶ 130, 134, 151, 169.
- Microsoft "used its control over OpenAI's supply of compute to extract maximum . . . value from ChatGPT consumers." *Id.* ¶¶ 127, 182, 184, 287, 303.

Critically, at no point does the Complaint allege that Microsoft set the price for ChatGPT subscriptions or that OpenAI even set the price by reference to what it paid Microsoft for cloud

computing services—nor could it. *See id.* ¶¶ 6-7, 63-68, 113, 146, 159-61, 173, 176, 178.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At a minimum, the allegations must "raise a right to relief above the speculative level." *Id.* at 555. Mere "labels and conclusions" do not suffice, nor do "naked assertion[s]" devoid of factual enhancement. *Id.* at 545, 557. Speculative theories, absent supporting facts, are likewise insufficient. *See id.* at 555–57; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Dismissal is proper where "there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The "specificity in pleading" is particularly important in antitrust cases, given the "unusually high cost of discovery" that antitrust defendants face if claims proceed past the pleading stage. *Twombly*, 550 U.S. at 558–59 (quotation omitted); *see also In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 53–54 (9th Cir. 2022) (affirming dismissal and cautioning against "open[ing] the floodgates to discovery in antitrust cases" absent sufficient "factual support").

## ARGUMENT

### I. Plaintiffs Fail to Plausibly Allege Antitrust Standing or Antitrust Injury

#### A. Plaintiffs Lack Antitrust Standing

Plaintiffs' Complaint fails to plead facts demonstrating antitrust standing, a threshold requirement that every plaintiff must satisfy in private antitrust suits. *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 448 (9th Cir. 2021) ("To plead a Sherman Act claim, a private plaintiff must show that it is a proper party to pursue the claim—a requirement known as antitrust standing."); *see also Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300 (S.D. Cal. 2009) (antitrust standing is a "threshold requirement").

Antitrust standing requires a plaintiff to demonstrate "injury in his business or property" by "reason of anything forbidden in the antitrust laws." *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig. (DRAM II)*, 536 F. Supp. 2d 1129, 1135, 1142 (N.D. Cal. 2008) (granting

motion to dismiss where plaintiffs lack antitrust standing). To determine whether a plaintiff has antitrust standing, the Court must consider: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type of harm the antitrust laws were intended to forestall; (2) the directness of the injury; and (3) the speculative measure of the harm. *See City of Oakland*, 20 F.4th at 455. Here, the alleged injury is both indirect and speculative.

### 1. Plaintiffs' Alleged Harm Is Indirect

Plaintiffs cannot show antitrust standing because their alleged "harm"—if any—rests entirely on OpenAI's independent pricing and product decisions, which they have not and cannot connect to Microsoft. *See id.* at 460 (finding Plaintiffs' allegations too indirect to support antitrust standing because there are "many uncertain links in the chain of causation"); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012) (finding Plaintiffs alleged injury "too remote" to allow recovery under the antitrust laws). Antitrust standing requires that the injury flow directly from the alleged restraint of trade; it cannot be derivative, indirect, secondary, consequential, or remote. *See City of Oakland*, 20 F.4th at 458.

Here, Plaintiffs do not allege they purchased any product or service from Microsoft or had any relationship with Microsoft at all. Each Plaintiff instead alleges only that they are current or former ChatGPT Plus subscribers and that ChatGPT Plus is OpenAI's subscription service. Compl. ¶¶ 6, 16-26. Their alleged injury, therefore, depends entirely on the price that a non-party—OpenAI—chose to charge them.

Plaintiffs also cannot connect their alleged injury to Microsoft for yet another reason: they do not allege that Microsoft had any role in setting the price of ChatGPT subscriptions. Indeed, Plaintiffs do not allege facts showing how OpenAI decided to price its subscriptions at $19.99 or $20.00 per month or that OpenAI considered the cost of Microsoft's supplied cloud services in setting its prices. At most, Plaintiffs allege that Microsoft provides an input (cloud services) to OpenAI and that the parties' agreement at one time was exclusive. But that does not establish the necessary connection ***between Microsoft and ChatGPT subscribers***. Because any alleged injury depends entirely on OpenAI's unilateral pricing and product decisions, Plaintiffs have not

established they suffered any injury flowing from Microsoft's conduct and thus lack antitrust standing. *See City of Oakland*, 20 F.4th at 460 (finding "too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries").

**2. Plaintiffs' Alleged Injury Is Speculative**

Plaintiffs' theory of injury is also speculative—they have not pleaded any facts suggesting what pricing or product quality would have been absent the challenged conduct. *Id.*; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983) (finding damages speculative because "the alleged effects . . . may have been produced by independent factors"). Plaintiffs allege they paid "inflated" prices for ChatGPT Plus and received "degraded" quality service. *See* Compl. ¶ 5. But this is precisely the type of conclusory allegation *Iqbal* dictates must be disregarded. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

*First*, Plaintiffs fail to plausibly allege they paid an "inflated" price. Each Plaintiff alleges they paid subscription prices of $19.99 or $20.00 per month at various times from February 2023 to the present, without variation, admitting the price remained the same. Compl. ¶¶ 16-26. Plaintiffs fail entirely to plead any ***facts*** supporting their contention that this subscription price was inflated.[5] Instead, they attempt a clumsy sleight of hand: they try to conflate the price of consumer ChatGPT subscriptions (the only "price" they paid) with the price of developer "API tokens" (a price they never allege they paid). *Compare id.* ¶¶ 16-26 (Plaintiffs paid $19.99 to $20.00 per month for ChatGPT Plus subscription) *and* ¶ 163 ("It's 136 times more expensive for input tokens.").

This comes as no surprise. ChatGPT Plus subscribers like Plaintiffs only pay a monthly subscription fee, nothing else. *Id.* ¶ 268. API tokens, on the other hand, are sold to developers in return for access to an AI provider's model. This allows the developers to embed the model's capabilities and technology into the developers' own apps, websites, and other tools. *Id.* ¶ 6.

---

[5] Plaintiffs do not allege any change to the price of ***ChatGPT subscriptions*** even after Microsoft and OpenAI renegotiated to end their exclusive cloud supply agreement. *See generally* Compl. ¶¶ 171-75.

Developers pay per-token pricing for access to these models—a price that necessarily varies based on the number of tokens actually used. *Id.* ¶ 154 n.3. Plaintiffs do not allege they ever purchased API tokens. *Id.* ¶ 6.[6] So Plaintiffs' attempt to rely on API token pricing to show injury to subscribers necessarily fails. *Id.* ¶¶ 16-26. Plaintiffs try to paper over this fatal flaw by summarily concluding in a footnote that there is a correlation between the per-token price for ChatGPT and the ChatGPT subscriptions. *Id.* ¶ 154 n.3. They allege no facts to support this alleged correlation.

*Second,* Plaintiffs fail to plausibly allege "degraded" product quality. *Id.* ¶¶ 5, 159, 161, 179. Plaintiffs speculate that "[d]egradation of quality may include the use of smaller models, the reduction of reasoning time or 'thinking' for reasoning models, and the slowing of response times on a tokens-per-second basis." *id.* ¶ 270. But they plead no facts showing they experienced so-called "degraded" quality or sought to access features and could not do so because of the challenged conduct. *See id.* ¶¶ 159, 161; *see also Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) (finding "hypothetical loss of consumer choice and innovation are entirely too conclusory and speculative").

Plaintiffs claim that "OpenAI was forced to delay the release of version 4.5 of its ChatGPT model due to inadequate compute." Compl. ¶¶ 291. But, to support this allegation, Plaintiffs rely solely on tweets from OpenAI's CEO Sam Altman referencing "GPU shortages" in February and March 2025. *Id.* ¶¶ 291-95. These tweets don't name or suggest any specific connection to Microsoft—as opposed to GPU shortages[7] in the market more generally—let alone any conduct by Microsoft to limit competition, harm OpenAI or its subscribers, or impact competition. At bottom, Plaintiffs' claim that "[b]ecause of Microsoft," OpenAI was "forced to delay the release of its cutting-edge model," is conclusory, unsupported by the facts alleged, and insufficient to establish antitrust standing. *See City of Oakland*, 20 F.4th at 448.

[6] Plaintiffs' own Complaint acknowledges that subscriptions and tokens have distinct prices. *Id.* ¶ 268 ("[G]enerative AI products have distinct prices, either a monthly charge for interacting with the product through a company's own UI, or an API, which is usually charged per million tokens provided to, or received from, the API.").

[7] Notably, the "largest provider of GPUs is Nvidia, which has an approximate 88% market share of GPUs." Compl. ¶ 206.

### B. Plaintiffs Fail to Plausibly Allege Antitrust Injury

Plaintiffs also fail to establish antitrust injury, which "requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Plaintiffs challenge an alleged restraint involving Microsoft's provision of compute services, which is a "necessary input . . . of a Computer Generative AI product." Compl. ¶¶ 9-10. But Plaintiffs' theory of harm is that they paid "inflated" prices for and received "degraded" quality service for ChatGPT Plus in the ***downstream*** CGAI market. *Id.* ¶ 5. Because Plaintiffs are not purchasers of the allegedly constrained compute services but instead are consumers of AI chatbots in an alleged CGAI market, they cannot establish antitrust injury.

Numerous cases in this Circuit explain that allegations of ***downstream*** consumer harm do not establish antitrust injury where the challenged conduct occurs in an ***upstream*** input market that the consumers do not participate in. That is particularly true where, as here, the upstream supplier does not control or influence the downstream prices at issue. As a result, Plaintiffs' alleged injuries are "experienced in another market" than Microsoft's alleged unlawful conduct. *DRAM II*, 536 F. Supp. 2d at 1137–38 (finding plaintiffs "failed to allege that their injuries as end users…were sufficiently tied to the DRAM market that was allegedly restrained by defendants' unlawful conduct.")*; see also, e.g.*, *Bakay v. Apple Inc.*, No. 24-5314, 2025 WL 3012822, at *2, *3 (9th Cir. Oct. 28, 2025) (finding no antitrust injury because alleged injury was in the smartphone and operating system prices while the alleged restraint affected only the separate browser-engine market); *Lorenzo*, 603 F. Supp. 2d at 1302–03 (finding injuries "too remote to support standing" because "Plaintiff's injuries occurred in a different market from the allegedly anticompetitive conduct"); *Cal. Crane Sch., Inc. v. Google LLC*, No. 21-CV-10001-HSG, 2023 WL 2769096, at *4 (N.D. Cal. Mar. 31, 2023) (finding no antitrust injury because there is a "mismatch between the market that was allegedly restrained and the market in which Plaintiff was allegedly harmed.").

*Feitelson* illustrates well the critical flaw in Plaintiffs' claim. There, Android consumers alleged that Google's revenue-sharing agreements with smartphone manufacturers restrained competition in the general search market. *See Feitelson*, 80 F. Supp. 3d at 1027–29. But the

consumers' injuries—higher handset prices and reduced handset quality—occurred in the separate handset market, not the general search market. *Id.* Because the alleged anticompetitive effects occurred in a different market from the alleged restraint, the Court found no antitrust injury. *Id.* The same defect dooms this case: Plaintiffs challenge a vertical agreement for the provision of cloud services to OpenAI but claim harm in a distinct downstream CGAI market. As *Feitelson* makes clear, a plaintiff cannot establish antitrust injury by pointing to conduct in one market and asserting harm in another; he must allege facts showing that the injury occurred "in the same market as and sufficiently close to the alleged anticompetitive conduct." *Id.* at 1028. Plaintiffs do not, and cannot, do so here. This mismatch is fatal to their antitrust claim. *See Cal. Crane*, 2023 WL 2769096, at *4.

In short, although Plaintiffs claim that Microsoft's upstream cloud agreement with OpenAI impacted those downstream subscription prices, their alleged injury is "experienced in another market"—not the one in which Microsoft is alleged to have unlawfully constrained. *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057. Because Plaintiffs have not suffered their injury "in the market where competition is being restrained" they have failed to plausibly allege an antitrust injury. *Id.*[8]

## II. Plaintiffs Fail to Plausibly Allege an Anticompetitive Agreement

The most basic requirement of any Section 1 claim is an anticompetitive agreement. But not all agreements violate Section 1. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197–98 (9th Cir. 2012). Plaintiffs must plead facts demonstrating that the challenged agreement or restraint is "unreasonable." *Gibson v. Cendyn Grp.*, LLC, 148 F.4th 1069, 1080 (9th Cir. 2025) (affirming dismissal for failure to state a Sherman Act claim); *see also, e.g., Texaco Inc. v. Dagher*, 547 U.S. 1, 2 (2006); *Ohio v. Am. Express Co.*, 585 U.S. 529, 530 (2018). Thus, to state a claim under Section 1, a plaintiff must show that the alleged agreement or restraint is "unreasonable" by pleading nonconclusory facts showing an injury to competition that raises a "reasonable expectation that discovery will reveal evidence" of the injury. *Brantley*, 675 F.3d at 1197–98.

---

8 Nor have Plaintiffs suffered antitrust injury in the CGAI market, which—as discussed further below—is highly competitive, according to Plaintiffs' own allegations. *See supra* Section II(B)(2).

Allegations that a practice "may or may not injure competition" do not meet this requirement. *Id.* The mere existence of an agreement between parties is not indicative of an unreasonable restraint of trade that harms competition, and courts routinely reject Section 1 claims where an agreement is fully consistent with legitimate commercial cooperation. *Id.*; *see also In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 977 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (finding "Plaintiffs have failed to plead facts showing that the AdBlue agreements were an unreasonable restraint on competition") (emphasis in original). Even "an exclusive agreement without more is not an antitrust violation." *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 605 (N.D. Cal. 2020) (finding no indication that the parties "agreed that the exclusive license would be used in an anticompetitive way."). And under *Twombly*, the claim must be plausible. *Twombly*, 550 U.S. at 545. Antitrust claims that defy basic economic logic cannot proceed. *See, e.g.*, *Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-CV-01143 YGR, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013) ("Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed."); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").

Here, Plaintiffs fail to plead any such plausible claim under either the per se or rule of reason framework. Their per se claim is facially deficient because it does not fit into the narrow categories that courts find per se unlawful, and their rule of reason claim fails to allege any anticompetitive effects. So instead, Plaintiffs attempt to contort a lawful supply agreement for the provision of computing power into something unlawful with rhetoric alone. Further, their theory for why the agreement is unlawful does not make economic sense. Plaintiffs' suggestion that Microsoft limited or withheld compute services strains credulity because it would risk reducing OpenAI's growth and revenues, which would risk reducing shared revenue and undermining Microsoft's investment in OpenAI. *See* Compl. ¶¶ 86-88, 93-94, 99. Moreover, Microsoft's "multiyear, multibillion" dollar collaboration (*id.* ¶ 99) provides a long-term incentive for Microsoft to support, not sabotage, OpenAI. It also defies logic to suggest that Microsoft ***charged more than OpenAI*** to shift users to Microsoft's own AI services, and Plaintiffs' concession that Microsoft Copilot's market share was

a fraction of ChatGPT's share proves the point. *Id.* ¶¶ 233–34; *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995).

If the Court reaches this motion, it should dismiss Plaintiffs' claim because in addition to the fact Plaintiffs' theory defies economic logic, this is not a per se case and the Complaint's allegations fail to demonstrate the anticompetitive effects required under the rule of reason.

**A. Per Se Treatment Does Not Apply**

An "unreasonable" agreement is either per se illegal or analyzed under the "rule of reason." *Gibson*, 148 F.4th at 1080, 1088 (affirming dismissal for failure to state a Sherman Act claim). The per se rule applies only when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output," *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996), and is reserved for those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5. Such practices include horizontal price-fixing, division of markets, and certain group boycotts. *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988).

To avoid the "fact-specific assessment of 'market power and market structure'" that is required under the rule of reason, Plaintiffs attempt to label this a per se case. *Ohio*, 585 U.S. at 541. *See* Compl. ¶ 304. Not so. This case does not involve horizontal agreements among competitors to fix prices, divide markets, or boycott customers. Rather, Plaintiffs challenge a vertical supply agreement between Microsoft (a supplier) and Open AI (a customer), which is a quintessential vertical agreement because it involves firms operating at different levels of commerce.[9] *Id.* ¶¶ 353-61; *see also Brantley*, 675 F.3d at 1198 (describing vertical agreements). Challenges to this type of vertical agreement are analyzed under the standard antitrust framework—the so called "rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877,

[9] The fact that Microsoft also distributes an AI chatbot (Copilot, which relies on technology supplied by OpenAI) does not render this a horizontal agreement. The challenged restraint involves the provision of Azure cloud services, which implicates Microsoft's role as a supplier to OpenAI, not as a competitor. *See, e.g.*, *Krehl v. Baskin Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) (treating territory limits imposed by a franchisor, despite its horizontal competition, as a vertical restraint); *United States v. Brewbaker*, 87 F.4th 563, 573–77 (4th Cir. 2023), *cert. denied*, 145 S. Ct. 544 (2024) (holding that restraints with mixed horizontal/vertical features are not deemed horizontal when the broader business relationship shows otherwise).

907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."); *see also Gibson*, 148 F.4th at 1080 ("To determine whether a restraint of trade caused by a vertical agreement is unreasonable, it is 'analyzed under the rule of reason…'"). Therefore, Plaintiffs' request for per se treatment should be rejected out of hand. *Dagher*, 547 U.S. at 5.

Indeed, Plaintiffs' own allegations indicate that the challenged vertical partnership helped spur innovation, including the development of more advanced GPT models and the ChatGPT chatbot. Compl. ¶¶ 64, 66-67, 92, 93, 99. This is not surprising, because Courts routinely find that vertical agreements have "procompetitive justifications that benefit consumers" that should be analyzed under the rule of reason. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015); *see also Leegin*, 551 U.S. at 894 (vertical restraints can have the procompetitive effect of increasing interbrand competition).

**B. Plaintiffs Fail to Plausibly Allege Anticompetitive Effects**

In a case specifically alleging harm to competition from a vertical supply agreement under the rule of reason, an antitrust plaintiff must show that the agreement at issue has anticompetitive effects "in the market where competition is [allegedly] being restrained," which Plaintiffs claim is the downstream CGAI market. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); *see also Gibson*, 148 F.4th at 1077 ("Section 1 requires a causal link between the contested agreement and an anticompetitive restraint of trade in the relevant market."); *Redbox Automated Retail, LLC v. Buena Vista Home Entm't., Inc.*, 399 F. Supp. 3d 1018, 1030 (C.D. Cal. 2019) (rejecting challenge to Disney's vertical distribution restrictions where "FAC includes no allegations about anticompetitive effects in the relevant [downstream] market for home movies generally.").

Anticompetitive effects can be shown through either direct or indirect evidence. *See Intel Corp. v. Seven Networks, LLC*, 562 F. Supp. 3d 454, 464 (N.D. Cal. 2021) (holding that Plaintiffs have failed to adequately allege anticompetitive effects). As explained below, Plaintiffs do not plausibly allege either direct or indirect evidence of anticompetitive effects here.

### 1. Plaintiffs Fail to Plausibly Allege Direct Evidence of Anticompetitive Effects

Direct evidence requires plaintiffs to "plead facts that, if proven, would show 'actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market.'" *HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1251 (N.D. Cal. 2023) (Pitts, J.) (dismissing Section 1 claim where Plaintiff did not facts sufficient to show harm to competition); *see also Brantley*, 675 F.3d at 1202 ("[A]llegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition" because "[b]oth effects are fully consistent with a free, competitive market.").

Plaintiffs do not plead any facts suggesting that by providing cloud services to OpenAI, Microsoft reduced output, increased prices, or decreased quality in the CGAI market. *HomeLight, Inc.*, 694 F. Supp. 3d at 1251. Indeed, the opposite is true. Microsoft's collaboration with OpenAI has led to significant innovations and increased competition in AI chatbots. *See* Compl. ¶[¶ 66-67, 92-93, 99. While Plaintiffs make conclusory claims that Microsoft's supply restrictions caused price increases, the Complaint shows that each Plaintiff paid OpenAI $19.99 or $20.00 per month at various points from February 2023 to the present for their ChatGPT Plus subscription. *Id.* ¶¶ 16-26. The price did not increase. Nor do Plaintiffs allege any change in ChatGPT subscription prices after the alleged exclusivity provisions were lifted—only that OpenAI lowered its ***token prices***. *Id.* ¶ 13. And alleged increases in ***API token prices*****—**which Plaintiffs did not pay—cannot sustain Plaintiffs' claim. *See infra* Section I(A)(2); Compl. ¶ 163. Plaintiffs, therefore, plead no harm from price increases in connection with the very services they purchased. *Id.*

Plaintiffs also do not allege that Microsoft controls OpenAI's commercial releases and service features. Again, Plaintiffs vaguely claim there were "degradations in quality" *id.* ¶ 11, while simultaneously acknowledging that OpenAI was a "first-mover" with "technological know-how" that "kicked off a boom in Generative AI." *Id.* ¶¶ 64, 72. Plaintiffs' quality allegations are, therefore, unsupported and, in fact, contradicted by their own Complaint and cannot substitute for

evidence of harm to competition.

**2. Plaintiffs Fail to Plausibly Allege Indirect Evidence of Anticompetitive Effects**

Indirect evidence requires plaintiffs to allege that the defendant has power within a properly defined relevant antitrust market. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Absent direct evidence, plaintiffs must demonstrate market power with evidence "that the defendant owns a dominant share of [the relevant] market" and "that there are significant barriers to entry and . . . existing competitors lack the capacity to increase their output in the short run." *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d at 980 (dismissing complaint and finding Plaintiffs failed to allege market power). Plaintiffs must also show substantial foreclosure from the exclusive agreement at issue. *See Feitelson*, 80 F. Supp. 3d at 1031 (finding Plaintiffs' allegations fail to demonstrate substantial foreclosure in the relevant alleged markets).

Plaintiffs fail to plead anticompetitive effects based on such indirect evidence. *See Newcal Indus., Inc.*, 513 F.3d at 1044 ("In order to state a valid claim under the Sherman Act…the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."). A relevant market must encompass the product at issue as well as all economic substitutes for the product. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (affirming dismissal for failure to plead plausible relevant market). Plaintiffs fail on both counts.

*First*, Plaintiffs do not allege that Microsoft has market power in a relevant antitrust market. *See In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d at 980 (finding Plaintiffs failed to allege facts to support a finding of market power). Plaintiffs plead only a CGAI market. Compl. ¶ 223. But that alleged market has numerous competitors including Google, Anthropic, Perplexity, DeepSeek, and xAI. *Id.* ¶¶ 231-32. Each of these competing services launched chatbots throughout the period that Plaintiffs claim competition was restrained. *Id.* ¶¶ 231-33, 236-37. And, within that crowded market, Plaintiffs' own allegations show that Microsoft's Copilot AI chatbot—which incorporates OpenAI's models per the parties' collaboration—had no more than between ***five and 14 percent of users*** in July and August 2025. *Id.* ¶¶ 233-36, 279-281. But "a market share of less than 50 percent is presumptively insufficient to establish market power." *Rebel Oil Co.*, 51 F.3d at

1438.[10]

Plaintiffs' attempt to aggregate the market shares of Copilot (5-14%) and OpenAI (80%) to manufacture market power fails as a matter of law. Under Supreme Court precedent, separate entities may be treated as a single economic actor only where their decision-making functions are not meaningfully independent and their conduct reflects a complete "unity of purpose." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984); *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (the relevant inquiry is whether the firms are "separate economic actors pursuing separate economic interests"). Nothing in the Complaint suggests that Microsoft and OpenAI share unified control, lack independent economic interests, or otherwise operate without separate decision-making discretion. *Id.* Moreover, only Microsoft is a defendant, which means that OpenAI's alleged market share is irrelevant to the market-power analysis. *See Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (plaintiff must show "***the defendant*** plays enough of a role in that market to impair competition significantly") (emphasis added); *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1024 (N.D. Cal. 2020) (same). Absent plausible allegations that Microsoft and OpenAI operate as a single economic entity—which are entirely lacking—OpenAI's purported share cannot be imputed to Microsoft and the Complaint fails to allege that Microsoft has market share in the relevant market.[11]

*Second*, as in all cases challenging an exclusive agreement, Plaintiffs must allege substantial foreclosure of competition in the line of business that is allegedly restrained—here, the cloud computing business that is used by, among others, AI companies who develop chatbots. *See Feitelson*, 80 F. Supp. 3d at 1029–30. The Sherman Act only prohibits exclusive agreements "if they substantially foreclose competition, that is exclude competitors from so much of the market

---

[10] As to Microsoft's supply of cloud services—an entirely different business from CGAI subscription services purchased by consumers—Plaintiffs plead no facts defining cloud services as a market, make no allegations of Microsoft's market power (*see* Compl. ¶¶ 208-14), and no non-conclusory allegations of harm to competition in cloud services.

[11] *Don Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749 (N.D. Cal. 2024) (Pitts, J.) is not to the contrary. In that case, the Court found that Energizer and WalMart's alleged agreement extended beyond pricing for batteries sold at WalMart whereby "Energizer let Walmart control the minimum retail prices for Energizer products at *all* retailers." *Id.* at 763. There is no such allegation here, where Microsoft is alleged only to have provided an input to OpenAI and OpenAI is not alleged to have set the prices for any competing chatbots.

that they cannot gain a solid foothold to compete." *T-Mobile US, Inc. v. WCO Spectrum LLC*, No. 2:23-CV-04347-AH-(EX), 2025 WL 3247762, at *6 (C.D. Cal. Oct. 31, 2025) (granting motion to dismiss and finding WCO has not pled facts establishing that it was barred from entering a market). "Substantial share" has been quantified as foreclosure of 40% to 50% of the relevant market. *Feitelson*, 80 F. Supp. 3d at 1030.

Here, Plaintiffs challenge Microsoft's and OpenAI's strategic collaboration, which included a provision requiring that OpenAI obtain (for a time) its compute services solely from Microsoft. To pass muster, Plaintiffs must allege facts demonstrating substantial foreclosure that prevents OpenAI's competitors from accessing compute from either Microsoft or other market providers. Compl. ¶¶ 151, 167; *T-Mobile US, Inc.*, 2025 WL 3247762, at *6. Yet Plaintiffs do not—and cannot—allege that competition for cloud compute services was foreclosed or that any developer-customer was denied access to these services either from Microsoft or any other provider. Indeed, Plaintiffs acknowledge that several major technology companies, including Google and Amazon "maintained massive cloud-computing infrastructure that could be used to train Generative AI models." Compl. ¶ 114. Absent foreclosure, there is no factual basis for inferring that the exclusivity provision meaningfully limited competition for compute services which thereby impacted competition among competing chatbot providers. There is, therefore, no basis to conclude that the provision foreclosed competition at all, let alone that it foreclosed 40-50 percent of the market, as required under Circuit law. *T-Mobile US, Inc. et al.*, 2025 WL 3247762, at *6; *Feitelson*, 80 F. Supp. 3d at 1030.

Because Plaintiffs plead neither direct nor indirect evidence that Microsoft's exclusive provision of cloud services to OpenAI unreasonably restrained trade, their Section 1 claim fails as a matter of law.

***

At bottom, Plaintiffs describe a collaboration that is both procompetitive and consistent with legitimate commercial cooperation, which is insufficient to plead a Sherman Act Section 1 claim. *See, e.g.*, *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d at 978; *Adaptive Power Sols., LLC*, 141 F.3d at 951 (affirming dismissal of antitrust claim because Plaintiffs failed to plead

facts showing alleged injury was "caused by a reduction, rather than an increase, in competition resulting from the restraint."). Because Plaintiffs plead no unlawful agreement, no foreclosure, and their case is entirely premised on an economically implausible theory, their Section 1 claim must be dismissed.

## III. Plaintiffs' State Law Claims Also Fail

### A. Most Plaintiffs Lack a Sufficient Nexus to California

Nine of the 11 named Plaintiffs[12] lack a sufficient nexus to California, which independently bars their ability to assert California statutory claims. California courts have acknowledged a general presumption against the extraterritorial application of state laws. *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011). As a result, Courts consistently hold that non-California plaintiffs cannot invoke California consumer or competition statutes where the alleged misrepresentations and injuries occurred outside California. *See, e.g.*, *Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1047 (C.D. Cal. 2019) ("[I]f the liability-creating conduct occurs outside of California, California law generally should not govern that conduct."); *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1148 (N.D. Cal. 2013) (finding "Plaintiffs have not alleged any activity within California except their own purchase of the Purchased Products"); *Kay v. Copper Cane, LLC*, 549 F. Supp. 3d 1014, 1021 (N.D. Cal. 2021) (dismissing Plaintiff's UCL claim and finding California consumer protection statutes "presumptively do not apply to occurrences outside California"); *Churchill Vill., L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000), *aff'd sub nom. Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) (finding UCL does not support claims by non-California residents where "none of the alleged misconduct or injuries occurred in California").

In determining whether California statutes can provide relief for non-California residents, courts consider "where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which advertising

[12] These are Plaintiffs Donovan (Colorado), Eidson (Washington), Halloran (Arizona), Marsolek (Virginia), Ouijdani (Washington), Payne (Ohio), Wolfson (New York), Zajac (Massachusetts), and Zhang (Michigan). Compl. ¶¶ 18-26.

and other promotional literature decisions were made." *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917–18 (C.D. Cal. 2011) (dismissing Plaintiffs claims because non-California residents "cannot allege a sufficient connection to California."). Allegations that "payment was mailed to an address in California and was deposited in California banks is insufficient" to assert claims under California law. *DMI v. Med. Sec. Card Co. LLC*, No. 5:13-CV-00713-JGB-OP, 2013 WL 12171848, at *3 (C.D. Cal. Oct. 3, 2013) (finding such claims "unconvinc[ing]"). Similarly, allegations that the Parties "both entered into an agreement with [a] third-party" that is located in California are "not relevant." *Id.*

Here, nine Plaintiffs reside in and purchased ChatGPT subscriptions in Colorado, Washington, Arizona, Virginia, Ohio, New York, Massachusetts, and Michigan. Compl. ¶¶ 18-26. Each of these Plaintiffs' alleged injuries occurred entirely in their home states, where they were billed, paid for ChatGPT subscriptions, and used the subscription service. *Id.* Even if Plaintiffs alleged that their payment was sent to a California address or deposited in California banks (they do not), this is insufficient to establish a sufficient nexus to California. *See DMI*, 2013 WL 12171848, at *3.

In fact, the only purported connection to California is the fact that a third-party, ***OpenAI***, is headquartered in California. ***But OpenAI is not a defendant in this case*** and Microsoft is headquartered in Washington State. Compl. ¶ 27. Beyond two conclusory allegations that "Microsoft's AI business is integrated heavily with OpenAI's San Francisco, California operations" and "Microsoft's AI business has a significant presence in San Francisco," Plaintiffs identify no facts that identify how, when, or in what way Microsoft allegedly took any action in California that caused or contributed to Plaintiffs' injuries. *Id.* ¶¶ 37-39. As in *DMI*, allegations that both parties entered into an agreement with a third-party that is based in California are irrelevant and insufficient to establish sufficient contacts with California, particularly where "[n]either party is a citizen of California and it appears that the misconduct alleged took place" out-of-state. *DMI*, 2013 WL 12171848, at *3 (finding "[t]hose allegations are primarily relevant to ***GNPPN's actions*** rather than Plaintiff's claims of wrongful conduct by Defendant.") (emphasis added). Because none of these Plaintiffs' alleged injuries occurred in California and they identify no California-based conduct that

caused their harm, these Plaintiffs lack the required nexus to California, and their California statutory claims must be dismissed. *Churchill*, 169 F. Supp. 2d at 1126.

**B. Plaintiffs' Cartwright Act Claim Fails**

Plaintiffs' Cartwright Act claim fails for two reasons as to all Plaintiffs. *First*, Plaintiffs plead only generalized, conclusory allegations. However, California requires a "high degree of particularity" in Cartwright Act pleadings, and courts routinely dismiss claims that rely on broad assertions of anticompetitive conduct without concrete facts. *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 149 F. Supp. 3d 1188, 1196 (E.D. Cal. 2015). As detailed above, Plaintiffs' allegations fall squarely within that prohibited category because they fail to plead non-conclusory factual allegations. *Second*, this claim fails because Plaintiffs' antitrust claims fail. The analysis for claims brought under the Cartwright Act mirrors federal antitrust law, and courts construe it in parallel with the Sherman Act. *See, e.g.*, *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act [] was modeled after the Sherman Act.") (citation omitted); *see also Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("[F]ederal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."). Because Plaintiffs' federal antitrust theories fail for the reasons articulated *infra* Sections I-IV, Plaintiffs' Cartwright Act claim necessarily fails as well.

**C. Plaintiffs' UCL Claim Fails**

Plaintiffs' UCL claim fails for at least three reasons.

*First*, Plaintiffs lack standing to bring a UCL claim. Under the UCL, a plaintiff must demonstrate that he has "suffered injury in fact and . . . lost money or property as a result of the unfair competition." *See* Cal. Bus. & Prof. Code § 17204; *see also Swain v. CACH, LLC*, 699 F. Supp. 2d 1117, 1122 (N.D. Cal. 2009) (granting motion to dismiss UCL for lack of standing where "the Complaint fails to allege that Plaintiff has lost any money or property"). But as explained above, Plaintiffs cannot meet that requirement because they do not allege they purchased anything from Microsoft or had any transaction, relationship, or exchange of value with Microsoft whatsoever. *See infra* Section I(A)(1). Plaintiffs' claim also fails because the UCL requires a

causal nexus between the alleged misconduct and the plaintiff's economic injury, and there is no such nexus here. *Daro v. Superior Ct.*, 151 Cal. App. 4th 1079, 1099, 61 Cal. Rptr. 3d 716, 729 (2007), *as modified on denial of reh'g* (July 3, 2007) ("When a UCL action is based on an unlawful business practice . . . there must be a causal connection between the harm suffered and the unlawful business activity."). Because Plaintiffs purchased ChatGPT Plus subscriptions solely from OpenAI based on OpenAI's pricing and service decisions, Plaintiffs allege no facts showing that Microsoft's exclusive cloud arrangement with OpenAI ***caused*** them to lose any money or property. Accordingly, Plaintiffs have not plausibly alleged any "lost money or property" because of Microsoft's conduct and therefore lack UCL standing. *See infra* Section I(A)(1).

*Second,* Plaintiffs' UCL claim fails under both the "unlawful" and "unfair" prongs. Compl. ¶ 411. The UCL prohibits "unlawful, unfair, or fraudulent," business acts. *See* Cal. Bus. & Prof. Code § 17200; *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The "unlawful" prong is premised on alleged Sherman Act or Cartwright Act violations and necessarily fails when those underlying claims fail. *See DRAM*, 28 F.4th at 54 n.7 (affirming dismissal of UCL claim where it was premised on the existence of an antitrust conspiracy and therefore rises and falls with the Sherman Act claim). Likewise, Plaintiffs do not allege any conduct that is "unfair" under any applicable UCL standard. *See Cel-Tech*, 20 Cal. 4th at 187 (1999) (defining "unfair" as conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition").

*Third*, Plaintiffs do not lack an adequate remedy at law, and their requested injunctive relief is moot, supplying yet another reason their UCL claims fail. To pursue equitable relief under the UCL, a Plaintiff must show that there is no adequate remedy at law. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (finding district court did not err in dismissing UCL claims where Plaintiff failed to establish that she lacks an adequate remedy at law). Courts will not grant equitable relief where damages are available and adequate. *Id.* Plaintiffs do not plausibly allege why damages would be inadequate in an alleged "overcharge" case and the only remedies available under the UCL are equitable—injunctive relief and restitution. *Hambrick v.*

*Healthcare Partners Med. Grp., Inc.*, 189 Cal. Rptr. 3d 31, 54 (Cal. Ct. App. 2015). Plaintiffs also seek an injunction based on the alleged exclusivity between OpenAI and Microsoft but acknowledge that any such exclusivity ended on June 10, 2025. Compl. ¶ 171. Thus, their request for injunctive relief is moot.

**CONCLUSION**

For these reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Dated: December 12, 2025

**Dechert LLP**

/s/ Russell P. Cohen
Russell P. Cohen (SBN 213105)
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Russ.Cohen@dechert.com

John (Jay) Jurata, Jr. (*pro hac vice* pending)
1900 K Street N.W.
Washington, DC 20006
Jay.Jurata@dechert.com

Julia Chapman (*pro hac vice* pending)
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
Julia.Chapman@dechert.com

*Attorneys for Defendant Microsoft Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ Russell P. Cohen*