United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL BRYANT, et al.,<br>Plaintiffs,<br>v.<br>MICROSOFT CORPORATION,<br>Defendant. | Case No. 25-cv-08733-PCP<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING MOTION TO DISMISS IN PART**<br><br>Re: Dkt. Nos. 20, 21 |

In their class action complaint, the plaintiffs here allege that defendant Microsoft Corporation violated federal and state antitrust laws by entering into an agreement with OpenAI in which OpenAI would rely exclusively on Microsoft to provide it with "compute"—the processing capacity needed to train OpenAI's models and provide outputs to users. Plaintiffs allege that Microsoft's agreement drove up OpenAI's costs and resulted in higher prices and worsened quality. Microsoft now moves to compel arbitration or, in the alternative, to dismiss plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court denies Microsoft's motion to compel arbitration and grants in part and denies in part Microsoft's motion to dismiss.

**BACKGROUND**

Plaintiffs are a proposed class of ChatGPT subscribers who subscribed from November 30, 2022, to the present.[1] Complaint ¶ 14. Plaintiffs allege that they are consumers in the "Consumer Generative AI Market" and that they "overpaid for ChatGPT subscription products from November 30, 2022, through February 1, 2025." Complaint ¶ 14.

[1] The Court assumes the truth of the allegations in the complaint for the purposes of Microsoft's motions.

OpenAI is a California nonprofit entity that offers the subscription-based ChatGPT product. Complaint ¶ 43. ChatGPT is a Consumer Generative AI (CGAI) product that responds to users' text prompts with text or image answers and other responses based on ChatGPT's internal models. Complaint ¶ 6. OpenAI released ChatGPT in November 2022. Complaint ¶ 6.

OpenAI needs "compute" to run OpenAI's models and generate answers to users' ChatGPT queries. Complaint ¶ 8. Large AI models require large numbers of computations to train their models. Complaint ¶ 205. This requires graphical processing units (GPUs), hardware that Microsoft had advantages in securing. Complaint ¶¶ 206, 208, 209. Microsoft's advantage in obtaining GPUs meant that it could provide the computational capacity that AI models need to produce outputs. Complaint ¶ 215. The computational capacity used to train AI models and infer outputs from them is a "necessary input" in CGAI products such as ChatGPT. Complaint ¶ 9.

Microsoft is a Delaware corporation headquartered in Washington state. Complaint ¶ 27. Microsoft provides cloud computing services through its Azure AI business line. Complaint ¶ 32. Azure "is one of only a handful of cloud computing clusters with adequate computational power for the training of large-scale … AI models." Complaint ¶ 82. Microsoft provides OpenAI with compute. In October 2023, Microsoft also started offering its own CGAI product called Copilot. Complaint ¶ 133.

In July 2019, Microsoft invested $1 billion in OpenAI in exchange for OpenAI agreeing to rely exclusively on Azure for OpenAI's cloud computing requirements. Complaint ¶¶ 86–89. Microsoft provided OpenAI with that $1 billion "in the form of Azure credits," which helped Microsoft earn OpenAI's business and take it away from its competitor Google. Complaint ¶ 89. Plaintiffs allege that OpenAI's reliance on Microsoft undermined OpenAI's ability to switch to a different cloud provider. Complaint ¶ 92.

After its initial 2019 investment, Microsoft expanded its involvement with OpenAI, investing an additional $10 billion in 2023 and incorporating OpenAI technology into Microsoft's Co-Pilot tool. Complaint ¶¶ 94–96. By the end of 2024, independent reporting confirmed that Microsoft had invested $13 billion in OpenAI and amassed a 20% stake in OpenAI's revenue. Complaint ¶ 102.

According to the initial 2023 agreement, OpenAI pays Azure more than $1 billion every year for server rentals. Complaint ¶ 104. Plaintiffs allege that Microsoft's exclusivity agreement dragged down OpenAI's success in 2023 and 2024. According to plaintiffs, OpenAI was the market leader for CGAI but was not profitable in large part because its costs "of responding to user queries by running the trained model[] remained high, particularly at the prices and capacity limits imposed on OpenAI's business by Microsoft." Complaint ¶ 125. Plaintiffs note that OpenAI CEO Sam Altman publicly acknowledged that a lack of compute capacity hindered OpenAI's operations. *See, e.g.*, Complaint ¶ 131.

Plaintiffs argue that the advent of Chinese company DeepSeek AI's CGAI product in January 2025 jostled OpenAI and Microsoft out of their complacency in the CGAI market. Complaint ¶¶ 140–166. DeepSeek produced a CGAI model that rivaled OpenAI's despite DeepSeek having less capital and access to GPUs. Complaint ¶ 140. DeepSeek reportedly offered prices for its application that were "up to 40 times lower than OpenAI's comparable models." Complaint ¶ 144. In response, OpenAI cut prices, Complaint ¶ 147, but could not compete effectively against DeepSeek because of Microsoft's exclusivity requirement, which "continued to constrain the supply of compute available to OpenAI." Complaint ¶ 151.

Plaintiffs allege that Microsoft eventually relaxed its constraint on OpenAI's compute capacity so that OpenAI could maintain its market dominance. Complaint ¶ 170. On June 10, 2025, OpenAI agreed to receive compute from Google, one of Microsoft Azure's competitors. Complaint ¶ 171, 172. On the same day, OpenAI cut its prices by 80%, which put OpenAI roughly "in line with the rest of the market." Complaint ¶¶ 173–177.

Plaintiffs' class action complaint alleges violations of Section 1 of the Sherman Act and California's Cartwright Act and Unfair Competition Law. Complaint ¶¶ 353–421. Plaintiffs allege that the relevant market is the United States Consumer Generative AI Market. Complaint ¶¶ 223–276. Plaintiffs allege that OpenAI possessed 82.65% of the CGAI market in July 2025, and that five competitors each had a market share below 10%, including Microsoft, which had a market share of 4.59%. Complaint ¶ 279. A different estimate of the relevant market shares in August 2025 concluded that OpenAI had a 60.4% market share with Microsoft's Copilot coming in

second place with a 14.1% market share. Complaint ¶ 281.

Plaintiffs allege that OpenAI and Microsoft's exclusivity agreement injured end users of CGAI applications. Complaint ¶¶ 287–305. Plaintiffs allege that OpenAI's dominance in the CGAI market is protected by an "AI Computation Barrier to Entry," or the large compute scale needed to be able to provide models comparable to market leaders such as OpenAI. Complaint ¶ 186.

Microsoft now moves to compel arbitration and to dismiss plaintiffs' lawsuit for failure to state a claim.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint does not do so, the defendant may move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## ANALYSIS

### I. Microsoft's Motion to Compel Arbitration

Microsoft argues that plaintiffs should be compelled to arbitrate their claims because OpenAI's Terms of Use (TOU) require mandatory arbitration for all claims "arising out of or relating to these Terms or our Services." MTC at 1–2, 4. "Where a nonsignatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are 'intimately founded in and intertwined with' the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013) (cleaned up) (quoting *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)); *see also Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707 (9th Cir. 2024).

Neither ground supports compelling arbitration here.

First, plaintiffs do not "rely on the terms of the written agreement in asserting [their] claims against" Microsoft and their claims are not "intimately founded in and intertwined with' the underlying contract." *Kramer*, 705 F.3d at 1128. Plaintiffs' theory of liability does not depend on a contractual entitlement between them and Microsoft or Open AI, nor must they rely on the terms of their user agreement with OpenAI to bring their claims against Microsoft. Plaintiffs allege that Microsoft's exclusivity provision constrained OpenAI's output and quality of CGAI services. The legality of that alleged restraint does not turn on their agreement with OpenAI.

For similar reasons, plaintiffs' claims are also not "intimately founded in and intertwined with the underlying contract." The TOU do not relate to or affect plaintiffs' exclusive dealing theory of antitrust liability. Plaintiffs' general right to be free of the harms of exclusive dealing "arise independently of" the TOU under federal and state antitrust laws. *See Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 949 (9th Cir. 2022) (cleaned up). And it goes without saying that plaintiffs "do not seek to enforce or challenge the terms, duties, or obligations of the" TOU.

*Kramer*, 705 F.3d at 1132.

Microsoft cites *Franklin v. Community Regional Medical Center*, 998 F.3d 867 (9th Cir. 2021), in support of its motion, arguing that under *Franklin* the only relevant consideration is whether the agreement containing the arbitration agreement is "central" to plaintiffs' claims. MTC at 14. *Franklin* held that a nurse's suit against a hospital for wage-and-hour violations had to be arbitrated because she was employed by a staffing company that "was responsible for reviewing the timekeeping records and raising any discrepancies with the Hospital." *Id.* at 875. In other words, Franklin's primary complaint was with her staffing company, not the hospital, and her agreement with the staffing company required arbitration of that complaint. In this case, by contrast, plaintiffs challenge Microsoft's exclusivity agreement with OpenAI and that agreement's effects on the terms of dealing in the CGAI market. Plaintiffs' agreement with OpenAI is in no way "central" to that dispute.

For the same reason, the instant case is distinguishable from this Court's decision in *Hunt v. Meta Platforms, Inc.*, 735 F. Supp. 3d 1133, 1137–38 (N.D. Cal. 2024). In *Hunt*, the plaintiff's claims against Google and Meta were "intimately intertwined" with his agreement with H&R Block because Hunt's theory of liability depended on establishing that plaintiffs had been defrauded in contravention of representations in H&R Block's agreement with Hunt. Here, plaintiffs' theory of liability against Microsoft is entirely independent of the TOU.

Microsoft also argues that this case is like *Herrera*, in which the Ninth Circuit concluded that airline passengers had to arbitrate claims against airlines whose tickets were purchased through a third-party. The Ninth Circuit explained that the plaintiffs' claims placed the third-party vendor's "conduct at issue," 104 F.4th at 708, in particular "whether the [third-party] travel agent breached its own terms," *Houghton v. Polychain Alchemy, LLC*, 2025 WL 2965204, at *4 (9th Cir. Oct. 21, 2025). In contrast here, neither plaintiffs nor Microsoft have put OpenAI's compliance with the TOU at issue.

Second, plaintiffs do not allege "substantially interdependent and concerted misconduct" that is "founded in or intimately connected with the obligations of the underlying agreement." *Kramer*, 705 F.3d at 1132–33; *see Herrera*, 104 F.4th at 713 (Forrest, J., dissenting).

United States District Court
Northern District of California

Microsoft is certainly correct that plaintiffs allege "substantially interdependent and concerted misconduct" by Microsoft and OpenAI given that the focus of their claims is the exclusivity agreement between those two companies. But that alleged misconduct is not founded in or intimately connected with the TOU. Microsoft suggests that because the TOU was a necessary condition for access to OpenAI's ChatGPT, any harms plaintiffs suffered arise from the TOU. *See* Reply at 12. But the Ninth Circuit rejected a similar argument in *Kramer*. There, Toyota argued that plaintiffs' suit against the car manufacturer was "intertwined" with plaintiffs' purchase agreements with independent Toyota dealers, but the Ninth Circuit rejected that argument, explaining that "[u]nder California law, mere reference to a term of the Purchase Agreements is not enough." *See Kramer*, 705 F.3d at 1132. That the price term set forth in the TOU provides one measure of the damages plaintiffs suffered also does not mean that plaintiffs' antitrust claims are founded in the TOU. The precise magnitude of the price term itself is not the source of Microsoft's liability. Instead, "the plaintiff's allegations must rely on or depend on the terms of the written agreement, not simply on the fact that an agreement exists." *Goldman v. KPMG, LLP*, 173 Cal. App. 4th at 231 (cleaned up). Here, plaintiffs' allegations do not rely on the terms of the written agreement because the terms do not establish Microsoft's rights or duties.

Microsoft also argues that plaintiffs agreed to arbitrate disputes about ChatGPT's price and quality. But that agreement governed only plaintiffs' disputes *with OpenAI*. Whether or not plaintiffs would be required to arbitrate an antitrust claim against OpenAI, this case presents only claims against Microsoft. Because plaintiffs never agreed to arbitrate those claims, the scope of their agreement with OpenAI is not relevant here.

Accordingly, Microsoft has not established either of the two conditions for compelling arbitration on an equitable estoppel theory. Microsoft's motion to compel arbitration is therefore denied.

## II. Microsoft's Motion To Dismiss for Failure To State a Claim

### A. Plaintiffs' Federal Claim

Microsoft moves to dismiss plaintiffs' federal claim under Rule 12(b)(6) for failing to plead antitrust standing, antitrust injury, or an illegal agreement. The Court need only address

Microsoft's argument that plaintiffs have not suffered antitrust injury because their alleged injury occurred in the CGAI market, not the "upstream input" cloud compute market in which OpenAI and Microsoft transact. MTD at 11–12.

A plaintiff pursuing federal antitrust claims "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). An antitrust injury must be "attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

Antitrust injury has four requirements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tele. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Plaintiffs satisfy the first three requirements. First, accepting the pleaded facts as true, plaintiffs have adequately alleged the "unlawful conduct" of an anticompetitive restraint. Second, plaintiffs have alleged harm from that unlawful conduct. Plaintiffs are users who allege that Microsoft's limitations on cloud compute capacity resulted in OpenAI having less ability to serve end users like them, hurting them in the form of higher prices and lower quality. Third, plaintiff's claimed injury "flows from that which makes the conduct unlawful." *Id.* Plaintiffs allege that they paid more than they would have absent Microsoft exercising its market power in cloud compute to extract an exclusivity requirement from OpenAI. If Microsoft did not have its exclusivity requirement, OpenAI's supply of CGAI output would purportedly have increased and plaintiffs would have received a better price for their CGAI purchase.

Plaintiffs have not, however, alleged an injury "of the type the antitrust laws were intended to prevent." *Id.* In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), the Supreme Court held that the plaintiff union failed to plead antitrust injury resulting from a multiemployer association's allegedly coercing third-party landowners and general contractors into dealing with nonunion firms. *Id.* at 527–28. In the process, the Supreme Court noted that "the Union was neither a consumer nor a competitor in the

market in which trade was restrained." *Id.* at 539. From *Associated General Contractors*, the Ninth Circuit has derived a general "corollary[] that the injured party [must] be a participant in the same market as the alleged malefactors." *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985); *see also Malheur Forest Fairness Coalition v. Iron Triangle, LLC*, 164 F.4th 710, 733 (9th Cir. 2026).[2]

Here, the relevant restraint is OpenAI's exclusivity agreement with Microsoft, which limited OpenAI's ability to purchase compute from other providers. Plaintiffs do not participate in that market at all. Plaintiffs argue, instead, that the relevant market here is the one they alleged in their complaint: the CGAI market. Opposition at 19. But under *Bhan*, that the consequences of an antitrust violation may be felt outside the immediate market in which that violation took place does not mean that those attenuated consequences are actionable under the federal antitrust laws. Instead, the Ninth Circuit has suggested that "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057.

Whether or not *Bhan*'s particular application of *Associated General Contractors* is dispositive, plaintiffs have not shown that they meet the fourth prong of the antitrust injury inquiry based on the underlying principles announced in *Associated General Contractors*. In that decision, the Supreme Court considered the union's failure to participate in the purportedly restrained

---

[2] The Court notes that the *Associated General Contractors* Court's observation that "the Union was neither a consumer nor a competitor in the market in which trade was restrained," 459 U.S. at 539, does not necessarily compel a requirement that an antitrust plaintiff must *always* "be a participant in the same market as the alleged malefactors," *Bhan*, 772 F.2d at 1470. The *Associated General Contractors* court noted the union's distinct status to suggest, in the next line, that the antitrust laws will often not apply to unions because "[i]t is not clear whether the Union's interests would be served or disserved by enhanced competition in the market." 459 U.S. at 539. The Supreme Court justified its holding that the union had not shown an antitrust injury based largely on the union's interests as a union and on labor law's particular policies and attempts to account for those policies. *Id.*; *but see id.* at 550–51 (Marshall, J., dissenting) (listing several injuries the plaintiff union could have suffered as a result of defendant's alleged antitrust violations). And the Supreme Court went on to consider several other facts relevant to the antitrust injury inquiry after noting the union's non-participation in the relevant market—an analysis that would have been entirely unnecessary if non-participation was dispositive. Rather than announcing any blackletter rule, which the Supreme Court deemed "virtually impossible," the Court explained that it would merely "identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Id.* at 536–37.

market, the indirectness of the injury to the union, the speculative nature of the union's damages, and the risk of duplicative or difficult-to-apportion damages in determining whether the union had pleaded antitrust injury. 459 U.S. at 539–45. Here, as in *Associated General Contractors*, these factors all weigh against permitting plaintiffs to pursue a federal claim. In their own telling, plaintiffs' injury was indirect, and it was OpenAI itself that suffered direct harm as a result of the exclusivity agreement. For the same reason, determining the extent to which the agreement—rather than, for example, OpenAI's own market dominance—resulted in plaintiffs paying a higher price is somewhat speculative and may require apportioning damages as between plaintiffs and OpenAI itself.

The core problem with plaintiffs' theory of antitrust injury is that they allege harm to a competitor in the market for CGAI, rather than harm to the market itself. Antitrust injury should arise from "a less competitive market due to either artificial restraints or predatory and exclusionary conduct." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). Here, Microsoft's compute constraint did not materially change the structure of the CGAI market (as DeepSeek's successful disruption of that market in 2025 demonstrates). The agreement did not change the number of competitors or change how they could compete against one another. Instead, according to plaintiffs' theory, it merely acted as a drag on OpenAI's performance. Plaintiffs are not competing compute providers foreclosed from being able to sell compute to OpenAI. Nor are plaintiffs competing CGAI providers foreclosed from accessing compute capacity necessary to compete with OpenAI. A contractual constraint inhibiting one competitor's ability to compete does not amount to an antitrust injury absent a broader harm to *the market's* ability to provide consumers a full range of options.

The "co-conspirator exception" also does not establish that plaintiffs have alleged a proper antitrust injury. The "co-conspirator exception" to the *Illinois Brick* rule "allows an indirect purchaser to sue when co-conspirators set the price paid by the plaintiff." *In re ATM Fee Antitrust Litig*. 686 F.3d 741, 750 (9th Cir. 2012). The exception "is not really an exception at all" but instead a recognition that if a plaintiff transacts directly with a co-conspirator to an antitrust violation, the plaintiff is not an indirect purchaser. *See In re NFL's Sunday Ticket Antitrust Litig*.

United States District Court
Northern District of California

933 F.3d 1136, 1157–58 (9th Cir. 2019). The co-conspirator exception does not change the fact that plaintiffs here do not participate in the upstream compute market. Plaintiffs do not experience antitrust injury because they only experienced the effects of Microsoft's exclusivity requirements through OpenAI's alleged difficulty to respond to increases in demand.

Accordingly, plaintiffs have not alleged that they suffered an "injury of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.*, 190 F.3d at 1055.[3]

### B. State Claims

Microsoft argues that plaintiffs' Cartwright Act and UCL claims both fail because most plaintiffs do not reside in California and because the state claims' plausibility depends on the Sherman Act claim's viability.

#### 1. Plaintiffs' Connection to California

California courts "presume the [California] Legislature did not intend a statute to be operative, with respect to occurrences outside the state, unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history." *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (cleaned up). The California Supreme Court has held that the "presumption against extraterritoriality applies to the UCL in full force." *Id.* In evaluating a proposed application of the UCL to extraterritorial violations, the California Supreme Court instructs courts to look to whether "relevant conduct occurr[ed] in California." *Id.* at 1208.

Here, plaintiffs have pleaded enough conduct that occurred in California to overcome the presumption against extraterritoriality. Most importantly, OpenAI is a San Francisco-based company, and plaintiffs allege that the "anticompetitive [exclusivity] agreement between OpenAI and Microsoft, occurred in and/or emanated from the State of California." Complaint ¶ 53. Given that Microsoft entered into an agreement with OpenAI, a California-based company, to constrain that company's conduct, the relevant conduct occurred in California. Plaintiffs also allege that, as part of the contractual arrangement between those parties, the head of Microsoft's AI division

[3] Though the Court need not address Microsoft's argument that plaintiffs also lack antitrust standing, the attenuated nature of plaintiff's injury also raises serious questions as to that issue.

United States District Court
Northern District of California

Mustafa Suleyman and the division as a whole "work[] directly with OpenAI's California-based engineers, including by working on-site at OpenAI's offices in San Francisco using OpenAI laptops." Complaint ¶ 37. Plaintiffs' allegations thus distinguish their case from those cited by Microsoft in which courts of this district concluded on different facts that plaintiffs' allegations did not "ha[ve] anything to do with California." *See Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1147–48 (N.D. Cal. 2013); *Kay v. Copper Cane, LLC*, 549 F. Supp. 3d 1014, 1021 (N.D. Cal. 2021).

Drawing all factual inferences in plaintiffs' favor, plaintiffs have alleged a connection between Microsoft and California sufficient to make plausible the inference that "relevant conduct occur[ed] in California." *Sullivan*, 51 Cal. 4th at 1208.

**2. Cartwright Act Claim**

Microsoft argues that plaintiffs' Cartwright Act claim should be dismissed because plaintiffs' allegations are conclusory and because the Cartwright Act "mirrors federal antitrust law." Motion to Dismiss at 22.

Plaintiffs' allegations are not conclusory: They plausibly allege the existence of an agreement between Microsoft and OpenAI to restrict OpenAI's use of cloud compute to Microsoft's Azure provider. And while California's Cartwright Act does closely track the federal Sherman Act, the two laws are not coterminous in all respects. "Although California law similarly [to federal antitrust law] requires an 'antitrust injury,' the scope of that term is broader." *Cellular Plus, Inc. v. Sup. Ct.*, 14 Cal. App. 4th 1224, 1234 (1993). For example, California has expanded the scope of injured persons who may pursue antitrust claims to those "who dealt either 'directly or indirectly' with the antitrust law offenders." *See* Cal. Bus. & Prof. Code § 16750(a). Here, plaintiffs allege that they dealt indirectly with Microsoft by purchasing CGAI for which compute was a necessary input.[4] Because Microsoft fails to make any further argument regarding plaintiffs'

[4] Microsoft cites the Ninth Circuit's decision in *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*, 28 F.4th 42 (9th Cir. 2022), in support of their contention that the Cartwright Act's requirements mirror those of the Sherman Act. But in that decision the Court merely noted that the plaintiffs' Cartwright Act claim, like its Sherman Act claim, required the plausible pleading of a conspiracy, and that the plaintiffs' failure to plead a conspiracy was dispositive as to both the plaintiffs' state and federal claims. *Id.* at 54 n.7.

failure to state a Cartwright Act claim, the Court denies Microsoft's motion to dismiss that claim.

**3. UCL Claim**

Microsoft moves to dismiss plaintiffs' UCL claim for three reasons. Motion to Dismiss at 22. First, Microsoft argues that plaintiffs have not shown that they were injured because of Microsoft's conduct or that Microsoft's conduct caused an economic injury. Motion to Dismiss at 22–23. Second, Microsoft argues that plaintiffs have failed to allege that Microsoft's conduct was either "unlawful" or "unfair." *See* Cal. Bus. & Prof. Code § 17200. Third, Microsoft contends that plaintiffs fail to plead an inadequate remedy at law, especially because plaintiffs themselves allege that Microsoft's exclusivity agreement with OpenAI ended on June 10, 2025. Complaint ¶ 171; Motion to Dismiss at 24; *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). None of Microsoft's arguments merit dismissal of the UCL claim.

First, plaintiffs allege Microsoft's conduct caused them economic injury. They allege that Microsoft's exclusivity agreement with OpenAI limited OpenAI's ability to lower its prices and thus resulted in their payment of higher prices. *See* Complaint ¶¶ 178, 179. While plaintiffs may not have *directly* transacted with Microsoft, they still allege that Microsoft's conduct led to their economic injuries.

Second, because Microsoft has not identified any basis for dismissing plaintiffs' Cartwright Act claim, plaintiffs have stated a UCL claim under the UCL's "unlawful" prong. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (9th Cir. 2002) ("By defining unfair competition to include any '*unlawful* business act or practice, the UCL permits violations of other laws to be treated as unfair competition that is independently actionable.") (cleaned up). Moreover, the Sherman Act and the UCL are not necessarily coterminous with respect to the "unfair" prong. For UCL claims regarding unfairness to consumers, "a court uses the balancing test, which weighs the utility of the defendants' conduct against the gravity of the harm to the alleged victim." *Epic Games. Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (cleaned up). At the pleadings stage, the Court cannot weigh "the utility of the defendants' conduct against the gravity of the harm to the alleged victim." *Id.*

Third, plaintiffs have alleged a plausible entitlement to injunctive relief and thus the lack

of an adequate remedy at law. Plaintiffs allege that even though Microsoft voluntarily lifted the exclusivity constraint on cloud compute in June 2025, that constraint still "sat (and sits) as a sword of Damocles wielded by OpenAI's own giant—and increasingly CGAI-focused—direct competitor." Complaint ¶ 180; Opposition at 24. Plaintiffs' complaint quotes at length from a June 16, 2025, article from the *Wall Street Journal* reporting on OpenAI's negotiations with Microsoft, and OpenAI's consideration of "a nuclear option" of "accusing Microsoft of anticompetitive behavior during the partnership." Complaint ¶ 181. Plaintiffs allege that Microsoft "could (and can) choose to enforce the compute restraint again, even to potentially eliminate OpenAI from the CGAI competitive landscape." Complaint ¶ 180. Given that Microsoft retains the ability to enforce the compute exclusivity agreement challenged in this lawsuit to plaintiffs' alleged detriment, plaintiffs adequately plead an entitlement to injunctive relief under the UCL.

Accordingly, Microsoft's motion to dismiss plaintiffs' UCL claim is denied.

**CONCLUSION**

For the reasons stated above, Microsoft's motion to compel arbitration is denied. Microsoft's motion to dismiss plaintiffs' Sherman Act claim is granted without prejudice and with leave to amend. Microsoft's motion to dismiss plaintiffs' state law claims is denied. If plaintiffs seek to amend their complaint, any amendment must be filed within 28 days of the issuance of this order. Failure to amend their complaint will result in dismissal of plaintiffs' Sherman Act claim with prejudice.

**IT IS SO ORDERED.**

Dated: September 28, 2026

P. Casey Pitts
United States District Judge